## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF ILLINIOS

KENNETH DILLENDECK                )
                                  )
        Plaintiff,                )    Case No. _____
                                  )
v.                                )
                                  )    MDL No. 3004
SYNGENTA CROP PROTECTION           )
LLC, SYNGENTA AG, and             )
CHEVRON U.S.A., INC.,             )    COMPLAINT WITH JURY TRIAL
                                  )    DEMANDED
        Defendants.               )

## COMPLAINT

Plaintiff Kenneth Dillendeck ("Plaintiff") brings this Complaint against Defendants Syngenta Crop Protection, LLC, Syngenta AG, and Chevron U.S.A., Inc. ("Defendants"), and alleges as follows:

### I.    Summary of the Case

1.    The manufacturers and sellers of Paraquat deliberately concealed the dangers of Paraquat for at least four decades, hid evidence of its dangers from government safety agencies, and knowingly marketed, distributed, and sold a product they knew caused Parkinson's Disease to the public.

2.    Paraquat is a synthetic chemical compound[1] that since the mid-1960s has been developed, registered, manufactured, distributed, sold for use, and used as an active ingredient in herbicide products ("Paraquat products") developed, registered, formulated, distributed, and sold for use in the United States ("U.S."), including the state of New York.

3.    From approximately May 1964 through approximately June 1981, Imperial

---

[1] Paraquat dichloride (EPA Pesticide Chemical Code 061601) or Paraquat methosulfate (EPA Pesticide Chemical Code 061602).

**COMPLAINT**                                                                    1

Chemical Industries Limited ("ICI Limited") and certain ICI Limited subsidiaries[2], and from approximately June 1981 through approximately September 1986, Imperial Chemical Industries PLC ("ICI PLC") and certain ICI PLC subsidiaries, each of which was a predecessor[3] of Defendant SYNGENTA AG ("SAG") and/or Defendant SYNGENTA CROP PROTECTION LLC ("SCPLLC"), were engaged, directly, acting in concert with each other, and/or acting in concert with Chevron Chemical Company, previously known as California Chemical Company ("CHEVRON"), in the business of developing, registering, manufacturing, distributing, and selling Paraquat for use as an active ingredient in Paraquat products, and developing, registering, formulating, and distributing Paraquat products for sale and use in the U.S., including in New York ("the U.S. Paraquat business").

4.      From approximately May 1964 through approximately September 1986, CHEVRON, a predecessor of Defendant CHEVRON U.S.A., INC. ("CUSA"), was engaged, directly and/or acting in concert with ICI[4], in all aspects of the U.S. Paraquat business.

5.      Between approximately May 1964 and approximately September 1986, ICI manufactured and sold to CHEVRON Paraquat ("ICI-CHEVRON Paraquat") for use by CHEVRON, and others to which CHEVRON distributed it, as an active ingredient in Paraquat products that CHEVRON and others formulated and distributed for sale and use in the U.S. ("ICI-CHEVRON Paraquat products").

6.      From approximately September 1986 through the present, ICI PLC and  certain ICI

---

[2] As used in this Complaint, "subsidiary" means a corporation or other business entity's wholly-owned subsidiary that is or formerly was engaged in the U.S. Paraquat business directly or acting in concert with others.

[3] As used in this Complaint, "predecessor" means a corporation or other business entity or subsidiary thereof, to which a Defendant is a successor by merger, continuation of business, or assumption of liabilities, that formerly was engaged in the U.S. Paraquat business directly or acting in concert with others.

[4] As used in this Complaint, "ICI" means ICI Limited and various ICI Limited subsidiaries through approximately June 1981 and ICI PLC and various ICI PLC subsidiaries thereafter.

**COMPLAINT**                                                                                          **2**

PLC subsidiaries (including predecessors of SCPLLC) initially, then other SAG predecessors and certain subsidiaries of each (including predecessors of SCPLLC), and most recently SAG and certain SAG subsidiaries (including SCPLLC), have been engaged, directly and/or acting in concert with each other, in all aspects of the U.S. Paraquat business.

7.      From approximately September 1986 through the present, ICI PLC and  certain ICI PLC subsidiaries (including predecessors of SCPLLC) initially, then other SAG predecessors and certain subsidiaries of each (including predecessors of SCPLLC),and most recently SAG and certain SAG subsidiaries (including SCPLLC), have manufactured Paraquat ("ICI-SYNGENTA Paraquat") for their own use, and for use by others to which they distributed it, as an active ingredient in Paraquat products that SCPLLC and its predecessors and others have distributed for sale and use in the U.S. ("ICI-SYNGENTA Paraquat products").

8.      During Plaintiff's time living in New York, Plaintiff was exposed to ICI-CHEVRON Paraquat products and/or ICI-SYNGENTA Paraquat products (collectively,"Defendants' Paraquat products").

9.      Plaintiff was exposed to Defendants' Paraquat products regularly between 1970 and 1978. Plaintiff worked on a farm where he personally mixed and sprayed Paraquat. It would get on his skin.   Today, Plaintiff suffers from Parkinson's disease caused by these years of regular exposure to Paraquat from Defendants' Paraquat products.

10.     Plaintiff brings this case to recover from Defendants under the following theories of liability, compensation for injuries and damages caused by the exposure of Plaintiff to Paraquat from Defendants' Paraquat products, plus costs of suit: strict product liability—design defect; strict product liability—failure to warn; negligence and willful and wanton conduct; public nuisance; and breach of the implied warranty of merchantability. Plaintiff also seeks  punitive damages.

11.     All allegations contained herein are based upon information and belief and to the

best of Plaintiff's knowledge given the information currently in Plaintiff's possession. Plaintiff reserves the right to amend all allegations upon continued information becoming available by discovery or otherwise.

## II.   Parties

### A. Plaintiff

12.     Plaintiff is a citizen of New York.  Plaintiff resides in Monroe County, New York.

13.     Plaintiff was exposed to Defendants' Paraquat products regularly between 1970 and 1978. He worked on a farm where he would personally mix and spray Paraquat and Paraquat would regularly get on his skin.

14.     Each exposure of Plaintiff to Paraquat from Defendants' Paraquat products caused or contributed to cause Plaintiff to develop Parkinson's disease by initiating a decades-long process in which oxidation and oxidative stress, created or aggravated by the ongoing redox cycling of Paraquat, damaged and interfered with essential functions of dopaminergic neurons in Plaintiff's SNpc, resulting in the ongoing degeneration and death, as time passed, of progressively more dopaminergic neurons.

15.     Defendants and those with whom they were acting in concert manufactured and distributed the Paraquat that was used in formulating Defendants' Paraquat products and to which Plaintiff was exposed and formulated and distributed Defendants' Paraquat products that contained the Paraquat to which Plaintiff was exposed, intending, or expecting that these products would be sold and used in the state of New York.

16.     When Plaintiff was exposed to Paraquat, Plaintiff neither knew nor could have expected that Paraquat was neurotoxic or that exposure to it could cause any neurological injury or neurodegenerative disease.

17.     When Plaintiff was exposed to Paraquat, Plaintiff neither knew nor could have

expected that wearing gloves, a mask, or other personal protective equipment or taking any other precautions might have prevented or reduced the risk of a neurological injury or neurodegenerative disease caused by exposure to Paraquat.

18.     Plaintiff only recently learned that Paraquat caused Plaintiff's injuries. Prior to this, Plaintiff did not have knowledge of any facts that would have put him on notice that Plaintiff's Parkinson's disease was due to Defendants' product, nor has there been widespread media coverage that put Plaintiff on notice.

**B.  Defendants**

19.     SYNGENTA CROP PROTECTION LLC is a Delaware limited liability company with its principal place of business in Greensboro, North Carolina. SCPLLC is a wholly owned subsidiary of Defendant SAG.

20.     SYNGENTA AG is a foreign corporation with its principal place of business in Basel, Switzerland.

21.     CHEVRON U.S.A., INC. is a Texas corporation with its principal place of business in San Ramon, California.

### III.     Equitable Tolling of Statute of Limitations

22.     Plaintiff had no way of knowing about Defendants' conduct with respect to the health risks associated with the use of Paraquat.  There is no way that Plaintiff, through the exercise of reasonable care, could have discovered the conduct by Defendants alleged herein.

23.     Further, Plaintiff did not discover and did not know of facts that would have caused a reasonable person to suspect Defendants engaged in the conduct alleged herein. For these reasons, the discovery rule tolls all statutes of limitations applicable to Plaintiff's claims.

24.     Additionally, by failing to provide immediate notice of the adverse health effects associated with continued use of and/or exposure to Paraquat and by continuing to sell Paraquat to

**COMPLAINT**                                                                                                                5

the public, Defendants concealed their conduct and the existence of the claims asserted herein from Plaintiff. Upon information and belief, Defendants intended their acts to conceal the facts and claims from Plaintiff and other individuals regularly exposed to Paraquat. Plaintiff was unaware of the facts alleged herein without any fault or lack of diligence on his part and could not have reasonably discovered Defendants' conduct. For these reasons, any statute of limitations that otherwise may apply to Plaintiff's claims should be tolled.

### IV.    Jurisdiction & Venue

25.    This Court has subject matter jurisdiction over this action because diversity jurisdiction exists under 28 U.S.C. § 1332(a)(3).

26.    The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, because Plaintiff seeks an amount that exceeds this sum or value on each of Plaintiff's claims against each Defendant.

27.    Complete diversity exists because this is an action between citizens of different states in which a citizen or subject of a foreign state is an additional party, in that:

      a.  Plaintiff is a citizen of the state of Washington;

      b.  SCPLLC is a citizen of the states of Delaware and North Carolina;

      c.  CUSA is a citizen of the Commonwealth of Texas and state of California; and

      d.  SAG is a citizen or subject of the nation of Switzerland.

28.    This Court has personal jurisdiction over Defendants by virtue of the United States Judicial Panel on Multidistrict Litigation's June 8, 2021 Transfer Order that centralized actions against Defendants in the Southern District of Illinois.

29.    Venue is proper in this district pursuant to the June 8, 2021 Transfer Order.

### V.    Allegations Common To All Causes Of Action

**A.  Defendants and their predecessors**

1. **Syngenta Crop Protection LLC and Syngenta AG**

30.    SAG is the successor in interest to the crop-protection business of each of its predecessors, AstraZeneca PLC ("AstraZeneca"), Zeneca Group PLC ("Zeneca Group"), ICI PLC, ICI Limited, and Plant Protection Limited ("PP Limited") and their respective crop-protection subsidiaries (collectively, "SAG's predecessors"), in that:

      a.  SAG, and each of SAG's predecessors, was the result of a corporate name change by, de facto consolidation or merger of, or mere continuation of, its immediate predecessor(s); and/or

      b.  SAG has expressly or impliedly agreed to assume any liability on claims arising from the historical operation of the crop-protection business of each of SAG's predecessors.

31.    SCPLLC is the successor in interest to the crop-protection business of each of its predecessors, Syngenta Crop Protection, Inc. ("SCPI"), Zeneca Ag Products, Inc. ("Zeneca Ag"), Zeneca, Inc. ("Zeneca"), ICI Americas, Inc. ("ICIA"),  ICI United States, Inc. ("ICI US"), and ICI America Inc. ("ICI America") (collectively, "SCPLLC's predecessors"), in that:

      a.  SCPLLC, and each of SCPLLC's predecessors, was the result of a corporate namechange by, de facto consolidation or merger of, or mere continuation of, its immediate predecessor(s); and/or

      b.  SCPLLC has expressly or impliedly agreed to assume any liability on claims arisingfrom the historical operation of the crop- protection business of each of SCPLLC's predecessors.

32.    At all relevant times, SCPLLC, SCPI, Zeneca Ag, Zeneca, ICIA, ICI US, and/or ICI America was a wholly-owned U.S. crop-protection subsidiary of SAG or a predecessor of SAG.

**COMPLAINT**                                                                                                       7

33.     At all relevant times, PP Limited was a wholly-owned U.K. crop- protection subsidiary of ICI Limited, an unincorporated division of ICI Limited, or an unincorporated division of ICI PLC.

34.     At all relevant times, SAG and its predecessors exercised a degree of control over their crop-protection subsidiaries so unusually high that these subsidiaries were their agents or alter egos.

### 2.  Chevron U.S.A., Inc.

35.     Upon information and belief, CUSA is the successor in interest to CHEVRON's crop-protection business, in that it has expressly assumed any liability on claims arising from the historical operation of that business.

### B.  Defendants' and their predecessors' involvement in the U.S. Paraquat business

36.     ICI Limited discovered the herbicidal properties of Paraquat in the mid-1950s; developed herbicide formulations containing Paraquat as an active ingredient in the early 1960s; and produced the first commercial Paraquat formulation, which it registered it in England and introduced in certain markets under the brand name GRAMOXONE®, in 1962.

37.     ICI Limited was awarded a U.S. patent on herbicide formulations containing Paraquat as an active ingredient in 1962.

38.     In May 1964, ICI Limited, PP Limited, and CHEVRON entered into an agreement for the distribution of Paraquat in the U.S. and the licensing of certain Paraquat-related patents, trade secrets, and other intellectual property ("Paraquat licensing and distribution agreement").

39.     As a result of the May 1964 Paraquat licensing and distribution agreement, Paraquat became commercially available for use in the U.S. in or about 1965.

40.     In April 1975, ICI Limited, ICI US, and CHEVRON entered into a new Paraquat licensing and distribution agreement that superseded the May 1964 agreement.

41.     In November 1981, ICIA, CHEVRON, and ICI PLC entered into a new Paraquat licensing and distribution agreement, effective January 1982, which superseded in part and amended in part the April 1975 agreement.

42.     From approximately May 1964 through approximately September 1986, pursuant to these Paraquat licensing and distribution agreements, ICI and CHEVRON acted in concert in all aspects of the U.S. Paraquat business.

43.     In September 1986, ICI and CHEVRON entered into an agreement terminating their Paraquat licensing and distribution agreement.

44.     Under the September 1986 termination agreement, ICI paid CHEVRON for the early termination of CHEVRON's rights under their Paraquat licensing and distribution agreement.

45.     Although the September 1986 termination agreement gave ICI the right to buy or exchange for ICI-labeled Paraquat products, CHEVRON-labeled Paraquat products that CHEVRON had already sold to its distributors, CHEVRON-labeled Paraquat products continued to be sold for use in the U.S. after this agreement for some period unknown to Plaintiffs.

46.     SAG, SAG's predecessors, and subsidiaries of SAG and its predecessors (collectively, "SYNGENTA"), have at all relevant times manufactured more Paraquat used as an active ingredient in Paraquat products formulated and distributed for sale and use in the U.S., including New York, than all other Paraquat manufacturers combined.

47.     From the mid-1960s through at least 1986, SYNGENTA (as ICI) was the only manufacturer of Paraquat used as an active ingredient in Paraquat products formulated and distributed for sale and use in the U.S., including New York.

48.     From approximately September 1986 through the present, SYNGENTA has:

    a.  manufactured Paraquat for use as an active ingredient in Paraquat products formulated and distributed for sale and use in the U.S., including New York;

b.  distributed Paraquat for use as an active ingredient in Paraquat products formulated and distributed for sale and use in the U.S., including New York;

c.  formulated Paraquat products distributed for sale and use in the U.S., including New York; and

d.  distributed Paraquat products for sale and use in the U.S., including New York.

## C.  The use of Paraquat products and Defendants' knowledge thereof

49.  Defendants' Paraquat products have been used in the U.S. to kill broadleaf weeds and grasses before the planting or emergence of more than 100 field, fruit, vegetable, and plantation crops, to control weeds in areas including orchards and golf courses, and to desiccate (dry) plants before harvest. At all relevant times, the use of Defendants' Paraquat products for these purposes was intended or directed by or reasonably foreseeable to SYNGENTA and CHEVRON.

50.  Defendants' Paraquat products were commonly used multiple times per year on the same ground, particularly when used to control weeds in places such as orchards and golf courses, and in farm fields where multiple crops are planted in the same growing season or year. At all relevant times, the use of Defendants' Paraquat products in this manner was intended or directed by or reasonably foreseeable to SYNGENTA and CHEVRON.

51.  Defendants' Paraquat products were typically sold to end users in the form of liquid concentrates that were then diluted with water in the tank of a sprayer and applied by spraying the diluted product onto target weeds. At all relevant times, the use of Defendants' Paraquat products in this manner was intended or directed by or reasonably foreseeable to SYNGENTA and CHEVRON.

52.  Defendants' Paraquat products were typically formulated with a surfactant or surfactants, and/or a surfactant, surfactant product, or "crop oil," which was commonly added by users of Defendants' products, to increase the ability of Paraquat to stay in contact with and

**COMPLAINT**                                                                                    10

penetrate the leaves of target plants and enter plant cells. At all relevant times, the use of Defendants' Paraquat products as so formulated and/or with such substances added was intended or directed by or reasonably foreseeable to SYNGENTA and CHEVRON.

53.     Knapsack sprayers, hand-held sprayers, aircraft (i.e., crop dusters), trucks with attached pressurized tanks, and tractor-drawn pressurized tanks, were commonly used to apply Defendants' Paraquat products. At all relevant times, the use of such equipment for that purpose was intended or directed by or reasonably foreseeable to SYNGENTA and CHEVRON.

**D.   Exposure to Paraquat and Defendants' knowledge thereof**

54.     When Defendants' Paraquat products were used in a manner that was  intended and directed by or reasonably foreseeable to SYNGENTA and CHEVRON, persons who used them and others nearby were commonly exposed to Paraquat while it was being mixed and loaded into the tanks of sprayers, including as a result of spills, splashes, and leaks. At all relevant times, it was reasonably foreseeable to SYNGENTA and CHEVRON that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

55.     When Defendants' Paraquat products were used in a  manner that was intended and directed by or reasonably foreseeable to SYNGENTA and CHEVRON, persons who sprayed them, and others nearby while they were being sprayed or when they recently had been sprayed, commonly were exposed to Paraquat, including as a result of spray drift (the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind), contact with sprayed plants and being exposed by Paraquat that was absorbed into the soil and ground water and wells. At all relevant times, it was reasonably foreseeable to SYNGENTA and CHEVRON that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

56.     When Defendants' Paraquat products were used in a  manner that was intended and

directed by or reasonably foreseeable to SYNGENTA and CHEVRON, persons who used them and other persons nearby commonly were exposed to Paraquat, including as a result of spills, splashes, and leaks, while equipment used to spray it was being emptied or cleaned or clogged spray nozzles, lines, or valves were being cleared. At all relevant times, it was reasonably foreseeable to SYNGENTA and CHEVRON that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

57.     At all relevant times, it was reasonably foreseeable to SYNGENTA and CHEVRON that when Defendants' Paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to SYNGENTA and CHEVRON, and people were exposed to Paraquat as a result, Paraquat could and did enter the human body via absorption through or penetration of the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage was present, and Paraquat that entered the human body in one or more of these ways would and did create a substantial risk of harm to people so exposed.

58.     At all relevant times, it was reasonably foreseeable to SYNGENTA and CHEVRON that when Defendants' Paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to SYNGENTA and CHEVRON, and people were exposed to Paraquat as a result, Paraquat could and did enter the human body via respiration into the lungs, including the deep parts of the lungs where respiration (gas exchange) occurs, and that Paraquat that entered the human body in this way would and did create a substantial risk of harm to people so exposed.

59.     At all relevant times, it was reasonably foreseeable to SYNGENTA and CHEVRON that when Defendants' Paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to Paraquat as a result, Paraquat could and did enter the human body via

**COMPLAINT**                                                                                          **12**

ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways, and that Paraquat that entered the human body in this way would and did create a substantial risk of harm to people so exposed.

60.     At all relevant times, it was reasonably foreseeable to SYNGENTA and CHEVRON that when Defendants' Paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to SYNGENTA and CHEVRON, and people were exposed to Paraquat as a result, Paraquat that entered the human body via ingestion into the digestive tract could and did enter the enteric nervous system (the part of the nervous system that governs the function of the gastrointestinal tract), and that Paraquat that entered the enteric nervous system would and did create a substantial risk of harm to people so exposed.

61.     At all relevant times, it was reasonably foreseeable to SYNGENTA and CHEVRON that when Defendants' Paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to SYNGENTA and CHEVRON, and people were exposed to Paraquat as a result, Paraquat that entered the human body, whether via absorption, respiration, or ingestion, could and did enter the bloodstream, and that Paraquat that entered the bloodstream would and did create a substantial risk of harm to people so exposed.

62.     At all relevant times, it was reasonably foreseeable to SYNGENTA and CHEVRON that when Defendants' Paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, SYNGENTA and CHEVRON, and people were exposed to Paraquat as a result, Paraquat that entered the bloodstream could and did enter the brain, whether through the blood-brain barrier or parts of the brain not protected by the blood-brain barrier, and that Paraquat that entered the brain would and did create a substantial risk of harm to people so exposed.

63.     At all relevant times, it was reasonably foreseeable to SYNGENTA and CHEVRON

that when Defendants' Paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to SYNGENTA and CHEVRON, and people were exposed to Paraquat as a result, Paraquat that entered the nose and nasal passages could and did enter the brain through the olfactory bulb (a part of the brain involved in the sense of smell), which is not protected by the blood-brain barrier, and that Paraquat that entered the olfactory bulb would and did create a substantial risk of harm to people so exposed.

64.     At all relevant times, it was reasonably foreseeable to SYNGENTA and CHEVRON that when Defendants' Paraquat products were used in a manner that was intended and directed by or reasonably foreseeable to SYNGENTA and CHEVRON, and people were exposed to Paraquat products that contained surfactants or had surfactants added to them, the surfactants would and did increase the toxicity of Paraquat toxicity to humans by increasing its ability to stay in contact with or penetrate cells and cellular structures, including but not limited to the skin, mucous membranes, and other epithelial and endothelial tissues, including tissues of the mouth, nose and nasal passages, trachea, conducting airways, lungs, gastrointestinal tract, blood-brain barrier, and neurons, and that this would and did increase the already substantial risk of harm to people so exposed.

**E.  Parkinson's disease**

65.     Parkinson's disease is a progressive neurodegenerative disorder of the brain that affects primarily the motor system, the part of the central nervous system that controls movement.

66.     The characteristic symptoms of Parkinson's disease are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

67.     Parkinson's disease's primary motor symptoms often result in "secondary" motor

symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

68.     Non-motor symptoms—such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression—are present in most cases of Parkinson's disease, often for years before any of the primary motor symptoms appear.

69.     There is currently no cure for Parkinson's disease; no treatment will stop or reverse its progression, and the treatments most prescribed for its motor symptoms tend to become progressively less effective, and cause unwelcome side effects, the longer they are used.

70.     The selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc") is one of the primary pathophysiological hallmarks of Parkinson's disease.

71.     Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

72.     The death of dopaminergic neurons in the SNpc decreases the production of dopamine.

73.     Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of Parkinson's disease.

74.     The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of Parkinson's disease.

75.     Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance

in the normal balance between oxidants present in cells and cells' antioxidant defenses.

76.     Scientists who study Parkinson's disease generally agree that oxidative stress is a major factor in—if not the precipitating cause of—the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of Parkinson's disease.

**F. Paraquat's toxicity**

77.     Paraquat is highly toxic to both plants and animals because it causes and contributes to cause the degeneration and death of living cells in both plants and animals.

78.     Paraquat causes and contributes to cause the degeneration and death of plant and animal cells both directly, through oxidation, and indirectly, through oxidative stress created or aggravated by the "redox cycling" of Paraquat; these processes damage lipids, proteins, and nucleic acids, molecules that are essential components of the structures and functions of living cells, and interfere with cellular functions—in plant cells, with photosynthesis, and in animal cells, with cellular respiration—that are essential to cellular health.

79.     In both plant and animal cells, Paraquat undergoes redox cycling that creates or aggravates oxidative stress because of the "redox properties" inherent in Paraquat's chemical composition and structure: Paraquat is both a strong oxidant and has a high  propensity to undergo redox cycling, and to do so repeatedly, in the presence of a suitable reductant and molecular oxygen, both of which are present in all living cells.

80.     The redox cycling of Paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can and often does initiate a cascading series of chemical reactions that can and often do create other reactive oxygen species that damage lipids, proteins, and nucleic acids, molecules that are essential components of the structures and functions of living cells.

81.     Because the redox cycling of Paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of Paraquat can trigger the production of countless molecules of destructive superoxide radical. After even a tiny amount of Paraquat enters the human brain, Paraquat molecules continue to undergo redox cycling and continue to cause damage to human brain cells. This repeated cycling continues in the presence of oxygen and continues to cause the death of dopaminergic neurons, eventually resulting in the onset of Parkinson's disease. However, even after the onset of Parkinson's disease, the redox cycling continues to cause brain cell damage and death for as long as the victim lives.

82.     The oxidation and redox potentials of Paraquat have been known to science since at least the 1930s, and in the exercise of ordinary care should have been known,  and were known, to SYNGENTA and CHEVRON at all relevant times.

83.     That Paraquat is highly toxic to all living cells—both plant cells and all types of animal cells—has been known to science since at least the mid-1960s, and in the exercise of ordinary care should have been known, and was known, to SYNGENTA and CHEVRON at all relevant times.

84.     The high toxicity of Paraquat to living cells of all types creates a substantial risk of harm to persons exposed to Paraquat, which SYNGENTA and CHEVRON should  have known in the exercise of ordinary care, and did know, at all relevant times.

85.     The same oxidation and redox potentials that make Paraquat highly toxic to plant cells and other types of animal cells make Paraquat highly toxic to nerve cells, including dopaminergic neurons, and create a substantial risk of neurotoxic harm to persons exposed to Paraquat. SYNGENTA and CHEVRON should have known this in the exercise of ordinary care, and did know this, at all relevant times.

### G.  Paraquat and Parkinson's disease

COMPLAINT                                                                                    17

86.     The scientific community overwhelmingly agrees that Paraquat causes Parkinson's disease.

87.     Although Parkinson's disease is not known to occur naturally in any species other than humans, Parkinson's disease research is often performed using "animal models," in which scientists produce laboratory animals that show features characteristic of Parkinson's disease in humans.

88.     Paraquat is one of only a handful of toxins that scientists use to produce animal models of Parkinson's disease.

89.     In animal models of Parkinson's disease, hundreds of studies involving various routes of exposure have found that Paraquat causes the degeneration and death of dopaminergic neurons in the SNpc, other pathophysiology consistent with that seen in human Parkinson's disease, and motor deficits and behavioral changes consistent with those commonly seen in human Parkinson's disease.

90.     Hundreds of *in vitro* studies (experiments in a test tube, culture dish, or other controlled experimental environment) have found that Paraquat causes the degeneration and death of dopaminergic neurons.

91.     Many epidemiological studies (studies of the patterns and causes of disease in defined populations) have found an association between Paraquat exposure and Parkinson's disease, including multiple studies finding a two- to five-fold or greater increase in the risk of Parkinson's disease in populations with occupational exposure to Paraquat compared to populations without such exposure.

**H.  Paraquat regulation**

92.     The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 *et seq*., which regulates the distribution, sale, and use of pesticides within the U.S., requires that

pesticides be registered with the EPA prior to their distribution, sale, or use, except as described by FIFRA. 7 U.S.C. 136a(a).

93.     As part of the pesticide registration process, the EPA requires, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

94.     As a general rule, FIFRA requires registrants—not the EPA—to perform health and safety testing of pesticides, and the EPA generally does not perform such testing.

95.     The EPA registers (or re-registers) a pesticide if it believes, based largely on studies and data submitted by the registrant, that:

    a.  its composition is such as to warrant the proposed claims for it, 7 U.S.C. §136a(c)(5)(A);

    b.  its labeling and other material required to be submitted comply with the requirements of FIFRA, 7 U.S.C. § 136a(c)(5)(B);

    c.  it will perform its intended function without unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(C); and

    d.  when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment, 7 U.S.C. § 136a(c)(5)(D).

96.     FIFRA defines "unreasonable adverse effects on the environment" as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb).

97.     Under FIFRA, "As long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]." 7 U.S.C. § 136a(f)(2).

98.     However, FIFRA further provides that "In no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA]." 7 U.S.C. § 136a(f)(2).

99.     FIFRA further provides that "…it shall be unlawful for any person in any State to distribute or sell to any person… any pesticide which is… misbranded." 7 U.S.C.  § 136j(a)(1)(E).

100.    A pesticide is misbranded under FIFRA if, among other things:

    a.  its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients which is false or misleading in any particular, 7 U.S.C. § 136(q)(1)(A);

    b.  the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and ifcomplied with, together with any requirements imposed under section 136a(d) of this title, are adequate to protect health and the environment, 7 U.S.C. § 136(q)(1)(F); or

    c.  the label does not contain a warning or caution statement which may be necessary and if complied with, together with any requirements imposed under section 136a(d) of this title, is adequate to protect health and the environment," 7 U.S.C. § 136(q)(1)(G).

101.    Plaintiff does not seek in this action to impose on Defendants any labeling or packaging requirement in addition to or different from those required under FIFRA; accordingly, any allegation in this complaint that a Defendant breached a duty to provide adequate directions for the use of Paraquat or warnings about Paraquat, breached a duty to provide adequate packaging for Paraquat, or concealed, suppressed, or omitted to disclose any material fact about Paraquat or engaged in any unfair or deceptive practice regarding Paraquat, is intended and should be construed to be consistent with that alleged breach, concealment, suppression, or omission, or unfair or

deceptive practice, having rendered the Paraquat "misbranded" under FIFRA.

102.    Plaintiff brings claims and seeks relief in this action only under state law. Plaintiff does not bring any claims or seek any relief in this action under FIFRA.

### VI.    Allegations Common To Specific Causes Of Action[5]

#### A. Strict product liability – design defect

103.    At all relevant times Defendants, and those with whom Defendants acted in concert, were engaged in the business of designing, manufacturing, and selling Paraquat within the U.S.

104.    At all relevant times Defendants, and those with whom Defendants acted in concert, intended and expected that Defendants' Paraquat products[6] would be sold and used in the state of New York.

105.    Defendant and those with whom it was acting in concert developed, registered, manufactured, distributed, and sold Paraquat for use in formulating Defendants' Paraquat products, and developed, registered, formulated, and distributed Defendants' Paraquat products for sale and use in the U.S., including New York.

106.    For many years, Plaintiff used Defendants' Paraquat products repeatedly and regularly, resulting in the repeated, regular,and prolonged exposure of Plaintiff to Paraquat as he personally sprayed Paraquat by tractor and hand-sprayer.

107.    Defendants, by and through their agents, servants, workers, contractors, designers, manufacturers, sellers, suppliers, and/or distributors, are strictly liable under §402A of the

---

[5] When used in an allegation in section VII or VIII of this Complaint, where the name of the party is not specified, "Defendant" refers to the Defendant or Defendants from whom relief is sought in the Count in which the allegation appears or is incorporated and/or the predecessors of that Defendant or those Defendants.

[6] When used in an allegation in section VII or VIII of this Complaint, "Defendants' Paraquat products": (1) refers to ICI-CHEVRON Paraquat products and/or ICI-SYNGENTA Paraquat products when the allegation appears or is incorporated in a Count directed to SCPLLC and SAG; refers only to ICI-CHEVRON Paraquat products when the allegation appears or is incorporated in a Count directed to CUSA.

Restatement (Second) of Torts because:

    a.  Defendants are engaged in the business of designing, manufacturing, assembling, distributing, selling and/or supplying their Paraquat products;

    b.  Defendants' Paraquat products which caused Plaintiff's damages were created, designed, marketed, and placed in the general stream of commerce by Defendants;

    c.  Defendants' Paraquat products were expected to and did reach users without substantial change in the condition in which they were designed, manufactured, distributed and/or sold; and

    d.  Defendants' Paraquat products were designed, manufactured, distributed and/or sold in the defective condition for the reasons set forth below.

108.    At all relevant times, Defendants' Paraquat products were in a defective condition that made them unreasonably dangerous when used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom Defendants acted in concert, in that:

    a.  they were designed, manufactured, formulated, and packaged such that when so used, Paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

    b.  when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, Paraquat was likely to cause or contribute to cause latent, permanent, and cumulative neurological

damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

109.   Defendants, by and through their agents, servants, workers, contractors, designers, manufacturers, sellers, suppliers, and/or distributors, are strictly liable under §402A of the Restatement (Second) of Torts, by:

a.   Designing, assembling, manufacturing, selling, supplying and/or distributing a product in a defective condition;

b.   Designing, assembling, manufacturing, selling, supplying and/or distributing a product which caused Parkinson's disease;

c.   Designing, assembling, manufacturing, selling, supplying and/or distributing a product that was known to be unfit for the purpose for which Defendants supplied the product;

d.   Designing, assembling, manufacturing, selling, supplying and/or distributing a product that was unreasonably dangerous to its intended and foreseeable users;

e.   Designing, assembling, manufacturing, selling, supplying and/or distributing a product that was not safe for all its intended and represented purposes;

f.   Designing, assembling, manufacturing, selling, supplying and/or distributing a product which lacked all the necessary safety features to protect users of Defendants' Paraquat products, including Plaintiff;

g.   Despite having actual knowledge of the harm caused by Defendants' Paraquat products, failing to adequately warn users that Defendants' Paraquat products caused the harm complained of herein;

h.   Despite having actual knowledge of the harm caused by Defendants' Paraquat

products, failing to make all the necessary corrections to eliminate the risk of Parkinson's disease;

i.   Failing to recall the defective and dangerous Paraquat products after the dangers and risks were known or discovered;

j.   Designing, assembling, manufacturing, selling, supplying and/or distributing a product for which the risks and hazards of far outweighed any utility or benefit of the product (i.e., in violation of the risk-utility test); and

k.   Designing, assembling, manufacturing, selling, supplying and/or distributing a product the risks of which were unknown or unknowable to the consumer (i.e., in violation of the consumer expectations test).

110.   At all relevant times, this defective condition in Defendants' Paraquat products existed when they left the control of Defendant and those with whom Defendants acted in concert and were placed into the stream of commerce.

111.   At all relevant times, Defendant and those with whom Defendants acted in concert knew or foresaw that this defective condition of Defendants' Paraquat products would create a substantial risk of harm to persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, but in conscious disregard for the safety of others, including Plaintiff, continued to place them into the stream of commerce.

112.   As a result of this defective condition, Defendants' Paraquat products either failed to perform in the manner reasonably to be expected in light of their nature and intended function, or the magnitude of the dangers outweighed their utility.

113.   At all relevant times, Defendants' Paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to Defendant and those with whom Defendants

**COMPLAINT**                                                                                                   24

acted in concert.

114.     At all relevant times, Defendants concealed the defective condition of their product from Plaintiff, thus preventing Plaintiff from discovering the causal link between Plaintiff's injuries and Paraquat.

**B.  Strict Product Liability – Failure to Warn**

115.     At all relevant times, Defendants and those with whom Defendants acted in concert were engaged in the U.S. Paraquat business.

116.     At all relevant times, Defendants and those with whom Defendants acted in concert intended and expected that Defendants' Paraquat products would be sold and used in New York.

117.     Defendants and those with whom Defendants acted in concert developed, registered, manufactured, distributed, and sold Paraquat for use in formulating Defendants' Paraquat products, and developed, registered, formulated, and distributed Defendants' Paraquat products for sale and use in the U.S., including New York.

118.     For many years, Plaintiff was repeatedly and regularly exposed to Paraquat by personally spraying and mixing Paraquat while working at peanut company in New York.

119.     At all relevant times, Defendants and those with whom Defendants acted in concert should have known in the exercise of ordinary care, and did know, that when used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom Defendants acted in concert:

     a.   Defendants' Paraquat products were designed, manufactured, formulated, and packaged such that when so used, Paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas nearwhere they had been sprayed; and

b.  when inhaled, ingested, or absorbed into the bodies of persons who used them, werenearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, Paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

120.   At all relevant times, Defendants' Paraquat products were in a defective condition that made them unreasonably dangerous when used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendant and those with whom Defendants acted in concert, in that:

a.  they were not accompanied by directions for use that would have made Paraquat unlikely to be inhaled, ingested, and absorbed into the bodies of persons who usedthem, were nearby while they were being used, or entered fields  or orchards wherethey had been sprayed or areas near where they had been sprayed; and

b.  they were not accompanied by a warning that when inhaled, ingested, or absorbedinto the bodies of persons who used them, were nearby while they were being used,or entered fields or orchards where they had been sprayed or areas near where theyhad been sprayed, Paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and that repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerativedisease, including Parkinson's disease, to develop over time and manifest long afterexposure.

121.   At all relevant times, this defective condition in Defendants' Paraquat products

existed when they left the control of Defendants and those with whom Defendants acted in concert and were placed into the stream of commerce.

122.    At all relevant times, Defendants and those with whom Defendants acted in concert knew this defective condition of Defendants' Paraquat products created a substantial risk of harm to persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, but in conscious disregard for the safety of others, including Plaintiff, continued to place them into the stream of commerce.

123.    As a result of this defective condition, Defendants' Paraquat products either failed to perform in the manner reasonably to be expected in light of their nature and intended function, or the magnitude of the dangers outweighed their utility.

124.    At all relevant times, Defendants' Paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendant and those with whom Defendants acted in concert.

125.    At all relevant times, Defendants concealed the defective condition of Paraquat from Plaintiff, thus preventing Plaintiff from discovering the causal link between Plaintiff's injuries and Paraquat.

### C.  Negligence

126.    At all relevant times, Defendants and those with whom Defendants acted in concert were engaged in the U.S. Paraquat business.

127.    At all relevant times, Defendants and those with whom Defendants acted in concert intended and expected that Defendants' Paraquat products would be sold and used in the state of New York.

128.    Defendants and those with whom Defendants acted in concert developed, registered, manufactured, distributed, and sold Paraquat for use in formulating Defendants' Paraquat products,

and developed, registered, formulated, and distributed Defendants' Paraquat products for sale and use in the U.S., including New York.

129.    For many years, specifically 1970 to 1978, Plaintiff was exposed to Defendants' Paraquat products in New York repeatedly and regularly due to his personal use of Paraquat while working on a farm and personally mixing and spraying Paraquat.

130.    At all relevant times, in designing, manufacturing, and distributing Paraquat for use in formulating Paraquat products and in designing, formulating, packaging, labeling, and distributing Paraquat products, Defendants and those with whom Defendants acted in concert owed a duty to exercise ordinary care for the health and safety of persons, including Plaintiff, whom it was reasonably foreseeable could be exposed to Paraquat in such products.

131.    When Defendants and those with whom Defendants acted in concert designed, manufactured, and distributed Paraquat for use in formulating Defendants' Paraquat products and designed, formulated, packaged, labeled, and distributed Defendants' Paraquat products, it was reasonably foreseeable and in the exercise of ordinary care Defendant should have known, and Defendants did know, that when Defendants' Paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to Defendants and those with whom Defendants acted in concert:

      a.    they were designed, manufactured, formulated, and packaged such that Paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

      b.    when inhaled, ingested, or absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, Paraquat was likely

to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

132.    In breach of their duty to Plaintiff, Defendants and those with whom Defendants acted in concert negligently, and in conscious disregard for the safety of others:

    a.   failed to design, manufacture, formulate, and package Defendants' Paraquat products to make Paraquat unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed;

    b.   designed and manufactured Paraquat and designed and formulated Defendants' Paraquat products such that when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' Paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, Paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

    c.   failed to perform adequate testing to determine the extent to which exposure to Paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used Defendants' Paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed

or areas near where they had been sprayed;

   d.   failed to perform adequate testing to determine the extent to which spray drift from Defendants' Paraquat products was likely to occur, including their propensity to drift, the distance they were likely to drift, and the extent to which Paraquat spray droplets were likely to enter the bodies of persons spraying Defendants' Paraquat products or nearby during or after spraying;

   e.   failed to perform adequate testing to determine the extent to which Paraquat, when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' Paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure;

   f.   failed to perform adequate testing to determine the extent to which  Paraquat, when formulated or mixed with surfactants or other pesticides or used along with other pesticides, and inhaled, ingested, or absorbed into the bodies of persons who used Defendants' Paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop

over time and manifest long after exposure;

g.  failed to direct that Defendants' Paraquat products be used in a manner that would have made it unlikely for Paraquat to have been inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

h.  failed to warn that when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' Paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed, Paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

133.  At all relevant times, Defendants' Paraquat products were used in a manner that was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, Defendants and those with whom Defendants acted in concert.

134.  At all relevant times, Defendants concealed the dangers of their product as listed above from Plaintiff, thus preventing Plaintiff from discovering the causal link between Plaintiff's injuries and Paraquat.

**D.  Breach of implied warranty of merchantability**

135.  At all relevant times, Defendants and those with whom Defendants acted in concert were engaged in the U.S. Paraquat business.

136.  At all relevant times, Defendants and those with whom Defendants acted in concert

intended and expected that Defendants' Paraquat products would be sold and used in the state of New York.

137.    Defendants and those with whom Defendants acted in concert developed, registered, manufactured, distributed, and sold Paraquat for use in formulating Defendants' Paraquat products, and developed, registered, formulated, and distributed Defendants' Paraquat products for sale and use in the U.S., including New York.

138.    While Plaintiff was tending the land that had been in his family since 1875 in New York, he was repeatedly and regularly exposed to Paraquat.

139.    At the time of each sale of Defendants' Paraquat products that resulted in Plaintiff's exposure to Paraquat, Defendants and those with whom Defendants acted in concert impliedly warranted that Defendants' Paraquat products were of merchantable quality, including that they were fit for the ordinary purposes for which such goods were used.

140.    Defendants and those with whom Defendants acted in concert breached this warranty as to each sale of Defendants' Paraquat products that resulted in Plaintiff's exposure to Paraquat, in that Defendants' Paraquat products were not of merchantable quality because they were not fit for the ordinary purposes for which such goods were used, and in particular:

      a.  they were designed, manufactured, formulated, and packaged such that Paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used them, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they had been sprayed; and

      b.  when inhaled, ingested, or absorbed into the bodies of persons who used Defendants' Paraquat products, were nearby while they were being used, or entered fields or orchards where they had been sprayed or areas near where they

had been sprayed, Paraquat was likely to cause or contribute to cause latent, cumulative, and permanent neurological damage, and repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease, to develop over time and manifest long after exposure.

### VII.   Punitive Damages

141.   Defendants' misconduct described herein consisted of oppression, fraud, and/or malice, and was done with advance knowledge, conscious disregard of the safety of others, and/or ratification by Defendants' officers, directors, and/or managing agents.

142.   Despite their knowledge of Paraquat's propensity to cause Parkinson's disease, Defendants chose profits over the safety of American citizens when they sought to create and market a chemical posing significant health risks.

143.   Further, despite having substantial information about Paraquat's serious and unreasonable side effects, Defendants failed to make the decision to recall and/or stop selling and marketing Paraquat after receiving reports from consumers that experienced Parkinson's disease associated with Paraquat exposure.

144.   Defendants also chose to remain ignorant as to why Paraquat had a propensity to cause Parkinson's disease. Defendants did not perform or document any further investigation. Defendants did not conduct a health hazard evaluation or risk analysis, and Defendants did not conduct a design review of the issue.

145.   Defendants' decision to remain ignorant of the risks presented by Paraquat, and how to reduce or prevent the risk, was done deliberately and with a conscious indifference to the health and safety of Paraquat users and people exposed to Paraquat.

146.   Instead of deciding to warn the public of Paraquat's dangers, Defendants

downplayed and recklessly disregarded their knowledge of Paraquat's potential for causing Parkinson's disease.

147.   Defendants chose to do nothing to warn the public about the serious and undisclosed side effects of Paraquat use and/or exposure.

148.   Consequently, Defendants are liable for punitive damages in an amount to be determined by the jury.

**VIII.   Plaintiff's Individual Allegations And Causes Of Action**

**COUNT 1 - STRICT PRODUCT LIABILITY - DESIGN DEFECT
PLAINTIFF v. DEFENDANTS SCPLLC AND SAG**

149.   Plaintiff incorporates in this Count by reference paragraphs 1 through 148 of this Complaint.

150.   As a direct and proximate result of the defective and unreasonably dangerous condition of Defendants' Paraquat products, Plaintiff developed Parkinson's disease; suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of Plaintiff's life; suffered the loss of a normal life and will continue to do so for the remainder of Plaintiff's life; and incurred reasonable expenses for necessary medical treatmentand will continue to do so for the remainder of Plaintiff's life.

**COUNT 2 – STRICT PRODUCT LIABILITY – FAILURE TO WARN
PLAINTIFF v. DEFENDANTS SCPLLC AND SAG**

151.   Plaintiff incorporates in this Count by reference paragraphs 1 through 148 of this Complaint.

152.   As a direct and proximate result of the lack of adequate directions for the use of and warnings about the dangers of Defendants' Paraquat products, Plaintiff developed Parkinson's disease; suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of Plaintiff's life; suffered the loss of a normal life and will

continueto do so for the remainder of Plaintiff's life; and incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of Plaintiff's life.

### COUNT 3 - NEGLIGENCE
### PLAINTIFF v. DEFENDANTS SCPLLC AND SAG

153.    Plaintiff incorporates in this Count by reference paragraphs 1 through 148 of this Complaint.

154.    As a direct and proximate result of the negligence of Defendants and those with whom Defendants acted in concert, Plaintiff developed Parkinson's disease; suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of Plaintiff's life; suffered the loss of a normal life and will continue to do so for the remainderof Plaintiff's life; and incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of Plaintiff's life.

### COUNT 4 - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### PLAINTIFF v. DEFENDANTS SCPLLC AND SAG

155.    Plaintiff incorporates in this Count by reference paragraphs 1 through 148 of this Complaint.

156.    As a direct and proximate result of the breaches of the implied warranty of merchantability by Defendants and those with whom Defendants acted in concert, Plaintiff developed Parkinson's disease; suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of Plaintiff's life; suffered the loss of a normal lifeand will continue to do so for the remainder of Plaintiff's life;; and incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of Plaintiff's life.

### COUNT 5 – STRICT PRODUCT LIABILITY - DESIGN DEFECT
### PLAINTIFF v. DEFENDANT CHEVRON U.S.A., INC.

157.    Plaintiff incorporates in this Count by reference paragraphs 1 through 148 of this

Complaint.

158.    As a direct and proximate result of the defective and unreasonably dangerous condition of Defendants' Paraquat products, Plaintiff developed Parkinson's disease; suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of Plaintiff's life; suffered the loss of a normal life and will continue to do so for the remainder of Plaintiff's life; and incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of Plaintiff's life.

### COUNT 6 – STRICT PRODUCT LIABILITY - FAILURE TO WARN
### PLAINTIFF v. DEFENDANT CHEVRON U.S.A., INC.

159.    Plaintiff incorporates in this Count by reference 1 through 148 of this Complaint.

160.    As a direct and proximate result of the lack of adequate directions for the use of and warnings about the dangers of Defendants' Paraquat products, Plaintiff developed Parkinson's disease; suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of Plaintiff's life; suffered the loss of a normal life and will continueto do so for the remainder of Plaintiff's life; and incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of Plaintiff's life.

### COUNT 7 -  NEGLIGENCE
### PLAINTIFF v. DEFENDANT CHEVRON U.S.A., INC.

161.    Plaintiff incorporates in this Count by reference paragraphs 1 through 148 of this Complaint.

162.    As a direct and proximate result of the negligence of Defendants and those with whom Defendants acted in concert, Plaintiff developed Parkinson's disease; suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of Plaintiff's life; suffered the loss of a normal life and will continue to do so for the remainderof Plaintiff's life; and incurred reasonable expenses for necessary medical treatment and will continue

to do so for the remainder of Plaintiff's life.

### COUNT 8 - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### PLAINTIFF v. DEFENDANT CHEVRON U.S.A., INC.

163.    Plaintiff incorporates in this Count by reference paragraphs 1 through 148 of this Complaint.

164.    As a direct and proximate result of the breaches of the implied warranty of merchantability by Defendants and those with whom Defendants acted in concert, Plaintiff developed Parkinson's disease; suffered severe and permanent physical pain, mental anguish, and disability, and will continue to do so for the remainder of Plaintiff's life; suffered the loss of a normal life and will continue to do so for the remainder of Plaintiff's life; and incurred reasonable expenses for necessary medical treatment and will continue to do so for the remainder of Plaintiff's life.

### IX.    Plaintiff's Prayer For Relief

165.    Plaintiff prays for judgment against all Defendants jointly and severally for damages, including punitive damages if applicable, to which Plaintiff is entitled by law, as well as all costs of this action, interest, and attorneys' fees to the full extent of the law, whether arising under the common law or statutory law.  This relief includes, but is not limited to, the following:

   a. Judgment for Plaintiff and against Defendants;

   b. Damages to compensate Plaintiff for Plaintiff's injuries, economic losses, pain, and suffering sustained as a result of the use of Paraquat;

   c. Pre- and post-judgment interest at the lawful rate;

   d. Punitive damages, if applicable, on all applicable Counts as permitted by law;

   e. A trial by jury on all issues of this case;

   f. An award of attorneys' fees; and

g.   For any other relief this Court may deem equitable and just, or that may be available under the law of another forum to the extent the law of another forum is applied, including but not limited to all reliefs prayed for in this Complaint and the foregoing Prayer for Relief.

**X.     Demand for Jury Trial**

166.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: February 29, 2024               Respectfully submitted,

*/s/ Ben C. Martin* _____
Ben C. Martin
Texas Bar No. 13052400
Jessica E. Murray
Texas Bar No. 24129138
BEN MARTIN LAW GROUP
3141 Hood Street
Suite 600
Dallas, Texas 75219
bmartin@bencmartin.com
jmurray@bencmartin.com

**COUNSEL FOR PLAINTIFF**